[Cite as *Bolin v. Ohio Bur. of Criminal Investigation*, 2023-Ohio-1841.]

**IN THE COURT OF CLAIMS OF OHIO**

| | |
|---|---|
| LYNN BOLIN | Case No. 2021-00198JD |
| Plaintiff | Magistrate Holly True Shaver |
| v. | DECISION OF THE MAGISTRATE |
| OHIO BUREAU OF CRIMINAL INVESTIGATION | |
| Defendant | |

{¶1} Plaintiff brings claims of employment discrimination in violation of R.C. 4112. Specifically, plaintiff argues that she was subjected to a hostile work environment created by age discrimination and that she was constructively discharged. The issues of liability and damages were tried to the court. Post-trial briefs were filed, and plaintiff's February 21, 2023 motion for an extension of time to file her reply brief is GRANTED, instanter.[1] For the following reasons, the magistrate recommends judgment in favor of defendant. The magistrate makes the following findings of fact and conclusions of law.

**Findings of Fact**

{¶2} Plaintiff began her employment with defendant, Ohio Bureau of Criminal Investigation (BCI) as a criminalist on August 1, 1988. BCI has three office locations: London, Richfield, and Athens, Ohio. In September 2003, plaintiff was promoted to supervise the London Biology/DNA section at BCI. Plaintiff was an exempt, classified employee but she was not a member of a bargaining unit. BCI is subject to the disciplinary policies of the Ohio Attorney General's Office (AGO), which provides for a policy of progressive discipline. (Defendant's Exhibit B, p. 1.) BCI's progressive discipline policy includes the following levels: (1) Verbal reprimand reduced to writing; (2) Written

---

[1] Although defendant presented a new argument in its post-trial brief asserting that plaintiff's claims were time-barred pursuant to R.C. 4112.02(L), defendant failed to raise this argument prior to or during trial. Therefore, the magistrate will not address it further.

reprimand; (3) Suspension; (4) Termination.  (Defendant's Exhibit A, p. 1.) Disciplinary action does not include corrective action such as coaching, training, or counseling.  *Id.*

{¶3} In August 2019, plaintiff became eligible to retire.  At that time, there were three supervisors in the BCI laboratory in London:  plaintiff, Kristin Slaper, and Sarah Smith.  Plaintiff was the only supervisor over 40 years old.  Although plaintiff worked for many supervisors over the years, her most recent supervisor was Dr. Karen Kwek. Plaintiff was born in 1966.  Kwek was born in 1961.  The issues in this case began in 2019 and ended with plaintiff's retirement in 2020.  Testimony at trial was elicited about the following incidents that plaintiff asserts led to her constructive discharge.

### 1.  August 7, 2019 Incident

{¶4} On July 1, 2019, plaintiff requested that an additional test be conducted on a case.  The staff member who was assigned to work on the case, Devonie Herdeman, saw plaintiff's request on a post-it note on the file, but decided to run a different test, crossed off what plaintiff had requested, and wrote on the note that she would run the test that plaintiff had requested after the results from the test that Herdeman conducted came back, if necessary.  Plaintiff discovered that her original instructions had not been followed on July 23, 2019, and she sent the case back to run the test as she had originally requested.  On August 7, 2019, once the results were in and plaintiff was conducting a final administrative review, plaintiff asked Herdeman to discuss the case in her office. Plaintiff testified that a conflict arose, Herdeman was getting red in the face,  Herdeman cursed loudly enough for others to hear, and then Herdeman abruptly left plaintiff's office. After the meeting, plaintiff memorialized her version of events in an email to both her supervisor at the time, Jennifer Duvall, and to Kwek.  (Plaintiff's Exhibit 2).  In plaintiff's email, she did not mention that Herdeman cursed, although she did mention that it was not the first time that Herdeman had "openly treated [her] with disrespect."  *Id.*

{¶5} Devonie Herdeman testified that when she saw the post-it note on the case file, she thought it was a deviation from what she would typically do.  Herdeman discussed the request with a robot operator (one of the scientists approved to use robot testing) and they determined that testing another sample that had not been previously tested would be a better idea than what plaintiff had requested.  Herdeman did not anticipate that the

decision would be problematic, because there are many layers of protocols with guidelines from both the FBI and BCI. Herdeman described plaintiff as being confrontational during the meeting in her office. Herdeman stated that from beginning to end, plaintiff was very curt and accusatory and that, no matter what she said to explain why she made the testing choice, plaintiff's demeanor was very cold and standoffish. Herdeman testified that she chose to follow the protocols in place instead of following plaintiff's request to do it a different way. After the confrontation with Herdeman, plaintiff testified that she was called into a meeting and chastised by Kwek for a variety of things, specifically, that she did not know what she was doing regarding testing protocols and that she did not communicate well.

## 2. Performance Improvement Plan

{¶6} Shortly thereafter, plaintiff took time off for a medical procedure from August 16 through September 29, 2019. Upon her return, plaintiff discovered that while she had been on leave, five staff members had complained to Duvall and Kwek about plaintiff's management and communication style. Plaintiff was called into a meeting with Kwek, Duvall, and Abby Schwaderer, Quality Assurance Manager, and was informed that she would be placed on a Performance Improvement Plan (PIP). (Plaintiff's Exhibit 1.) Plaintiff testified that she asked to change some of the language set forth in the PIP because she felt that much of it was untrue. However, the language was not amended, and Kwek asked plaintiff if she was refusing to sign the PIP. Plaintiff eventually signed the PIP because she felt there would be repercussions if she did not. Plaintiff complied with the requirements set forth in the PIP: she met with supervisors on a weekly basis for four weeks, and staff were interviewed about her performance. Plaintiff believes that she successfully completed the PIP requirements but testified that she was never officially notified that she had completed the PIP.

{¶7} Schwaderer testified that she handles corrective action plans for the lab at BCI. Schwaderer stated that she issued a PIP to plaintiff based upon complaints from several employees who had reported poor interactions with plaintiff, which are documented in the PIP, such as intimidating and demeaning behavior toward staff, aggressive body language, inconsistent administrative review practices, and a lack of

knowledge of the current DNA workflow for supervision purposes. (Plaintiff's Exhibit 1.) Hallie Dreyer, forensic scientist at the time, also corroborated testimony that after the incident with Herdeman, the scientists brought up issues they had about plaintiff, including lack of communication, feeling uncomfortable speaking up, and the way cases were handled.

{¶8} The PIP was set to expire on October 29, 2019. (*Id.*, Defendant's Exhibit H.) Schwaderer testified that she kept notes from her weekly meetings with plaintiff about the PIP, attached to the PIP in Defendant's Exhibit H. Schwaderer stated that plaintiff completed every action in the PIP, that plaintiff had made great progress, and that staff had positive feedback for plaintiff. Schwaderer's notes from the final meeting on October 29, 2019 state that "[a]ll PIP assignments were successfully completed. I provided a copy of the Emotional Intelligence 2.0 Summary document and highlighted topics associated with the PIP specifically, as a resource for Lynn going forward." (Defendant's Exhibit H, p. 18 of 19.) Schwaderer testified that a PIP is not considered discipline, although it does remain in an employee's personnel file. Kwek testified that plaintiff successfully completed the PIP within the four-week timeframe and there was no need to extend it.

### 3. December 6, 2019 incident

{¶9} Plaintiff testified that on December 6, 2019, when she returned from the Athens office, she received a telephone call. Although the caller ID displayed the name of Lewis Maddox, the DNA technical leader in the Richfield office, when she picked up the phone it was actually Kwek who yelled at her and told her that her communication skills had not improved at all, despite the PIP. Plaintiff admitted on cross-examination that Kwek did not threaten to discipline her during the phone call. Kwek testified that she did not recall any phone call of that nature, but that Kwek had no plans to discipline plaintiff at that time.

### 4. June 8, 2020 Incident

{¶10} In early 2020, after a new Attorney General was elected, BCI's administration reorganized its structure and Kwek became plaintiff's direct supervisor. In the spring of 2020, plaintiff took medical leave and returned on June 8, 2020. Plaintiff testified that the

same day, Kwek called her on her personal cell phone after work hours and said to her during their conversation, "Why don't you just retire?" Plaintiff thought the remark was unusual because she had undergone approximately ten surgeries in five years, but Kwek had never called her at home to ask her how she was doing before. Kwek testified that she recalled asking plaintiff the question, but Kwek remembered the conversation taking place in plaintiff's office after plaintiff had returned to work following a medical procedure. Kwek stated it was a friendly conversation, and she asked the question out of empathy. Kwek testified that she was not sure whether plaintiff was eligible to retire when she asked the question because she did not have access to plaintiff's information with OPERS. However, Kwek stated that she and plaintiff had known each other through work for over 20 years.

### 5. Athens Rush Case

{¶11} On Tuesday, August 4, 2020, the Athens intake office technician notified plaintiff that she was taking in a case and the sheriff was requesting a rush. Plaintiff emailed her section to let them know the case was on its way and requested that someone look at it as soon as possible. Approximately 45 minutes later, one of the scientists, Malorie Kulp, asked if DNA data was needed by the end of the week, and, if so, stated it would need to be completely extracted by the end of Thursday for her to be able to do it and not accrue overtime. Plaintiff testified that she was working from home that day, and she had wanted to review the case facts prior to responding, but her remote VPN kept failing. Plaintiff further testified that although she kept checking to see if the paperwork had been uploaded, she did not respond to Kulp's email. On Wednesday afternoon, Slaper responded to do what was possible to move it along. On Thursday afternoon, plaintiff apologized for not responding sooner, but agreed that the case should be moved along as much as possible.

{¶12} On Thursday, August 6, 2020, plaintiff was asked to attend a meeting with Kwek and Schwaderer about "follow-up." Plaintiff thought the meeting was about finalizing the PIP. Instead, plaintiff was surprised when Kwek criticized her and told her that someone had complained that plaintiff had not responded timely about the Athens case. According to plaintiff, Kwek told her that she would issue a verbal counseling

reduced to writing, but plaintiff never received anything in writing as a result of the meeting. Plaintiff admitted on cross-examination that although her VPN was not working, in hindsight, plaintiff could have responded to Kulp's question via telephone. Kulp testified that plaintiff did not respond to her inquiry on Tuesday around noon until Thursday afternoon, and only after another supervisor had responded. Kwek denied stating that she would issue a verbal counseling reduced to writing about this incident.

### 6. Administrative Review Case

{¶13} On Friday, August 7, 2020, at 8:18 a.m., plaintiff notified her staff that she had injured herself leaving the lab on Thursday night and that she would be working from home until after her doctor's appointment that day. Sarah Smith let plaintiff know that she could cover if plaintiff did not want to go into the lab. Plaintiff responded by saying that she would check in after her appointment, and she did that at 10:48 a.m. Smith related that everything was under control and that there was no need for plaintiff to go into the lab. These conversations are reflected in Plaintiff's Exhibit 3.

{¶14} After those emails, Slaper then asked plaintiff about a different case that plaintiff had been working on suggesting that a conference call be arranged. Slaper included Kwek on the email. At 11:48 a.m., Kwek sent plaintiff an email and included Schwaderer on it, criticizing her for the length of time the case had been in administrative review status and stated:

> Why does it take a lesser experienced supervisor to recommend a conference call to get Tim, Amy and you discussing this case, and you have had this case for admin review for well over a week? We also have Skype and Teams available for our use. This is unacceptable to sit on an admin review for this long and not initiate a virtual meeting. This is exactly what we referenced yesterday about timely communication when we addressed the open Complaint and counseling.

(Plaintiff's Exhibit 3, p. 2.) Plaintiff responded that she had gone to the lab to meet with appropriate parties, but that Amy had been too busy with other things to have a meeting. *Id.* Kwek responded in an email to plaintiff, Schwaderer, and Maddox stating:

"Regardless, letting an admin sit for over a week is excessive. Please make this meeting happen." *Id.*, p. 1.

{¶15} Kwek testified that there were two different things going on in the emails. One was the rush case from Athens, which was brought to her attention by a scientist, and the other was the administrative review case, which was brought to her attention by Maddox. According to Kwek, she had no intention of firing plaintiff at this point, and she did not think the emails were discipline. Kwek stated that the issues were about responding in a timely manner to subordinates' emails and communication.

### 7. Batch Processing Issue

{¶16} On Tuesday, August 11, 2020, one of the analysts, Allison, notified plaintiff that she was not feeling well and that she hoped to come in later in the day. Allison's duties included assembling batches of samples for the other scientists to work on. Upon arrival to the lab, plaintiff added Allison's name to the calendar showing that she was tentative for the day and plaintiff noticed there were three batches available for scientists to test. Thereafter, Allison called plaintiff at 11:00 a.m., said she was feeling better, and stated that she would be in by noon. However, after the three batches had been taken and there were no more batches in the basket, multiple scientists complained to plaintiff that she had not told them that Allison was not coming in.

{¶17} Even though plaintiff told the scientists that Allison would be in shortly, Kwek then called plaintiff and told her that she had held up the section the entire day by failing to communicate. Plaintiff testified that Kwek told her she would be getting a written reprimand for this incident, but plaintiff admitted she never received a written reprimand. Hallie Dreyer testified that she was frustrated at plaintiff's lack of communication about Allison's availability, and that the lack of communication directly affected the flow of work that day. Kwek testified that employees were frustrated that plaintiff had not communicated to them that Allison would not be in until noon, and she reminded plaintiff to have timely communication with staff. Kwek testified that there was no attempt to terminate plaintiff's employment at this time and did not recall saying that she would issue a written reprimand. Kwek did recall telling plaintiff that time was of the essence.

### 8. Athens Alarm Incidents

{¶18} Plaintiff testified that, periodically, the alarms would go off at the Athens location and employee Amanda Dillon would check on the building, consult security services and law enforcement, and then notify plaintiff via email of the details of the event so that plaintiff could forward information to upper administration. Plaintiff's Exhibits 4 and 5 document these issues.

{¶19} On August 12, 2020, plaintiff received an email from Kwek, who also copied Schwaderer. In the email, Kwek states that she spoke to Dillon to get information about alarm incidents at the Athens location, because Kwek noticed that Dillon's usual start time varied on her timesheet, but the alarm was not documented as it should have been. The dates of the alarm incidents were June 3 and July 7, 2020.

{¶20} Kwek stated in her email: "This lack of verification and consistency falls short of a supervisory responsibility." (Plaintiff's Exhibit 4, p. 2.) Plaintiff responded that she had been in the hospital on June 3, but Kwek further stated that: "You approved [Dillon's] OPA (timesheet) on 6/8 and should have questioned her start time which was earlier than usual (7 am)." Plaintiff testified that Dillon notified both Kwek, the Human Resources officer, and herself on June 3, 2020, of how she documented the alarm incident and her hours that day, so Kwek should have already been aware of this issue, and plaintiff was on approved leave at the time.

{¶21} Kwek testified that it became an issue because the director of security asked her about it, and she noticed that the alarm incident was not noted in the OPA task tracker. If it had been documented correctly, Kwek could have given that information to the director of security without contacting plaintiff. Kwek brought it to plaintiff's attention because, even if she was not present at the time, she approved Dillon's timesheet and it was not Dillon's usual start time. Kwek stated that plaintiff should have noticed it when she approved the timesheet. According to Kwek, the email was not discipline.

{¶22} Plaintiff testified that prior to 2019, she had never been issued any disciplinary or corrective actions, but once Kwek became her supervisor, she was placed on a PIP, was told she would receive a verbal reprimand reduced to writing and was threatened with a written reprimand. However, plaintiff admitted on cross-examination that for the entirety of her employment, she was never actually issued formal discipline.

On August 14, 2020, plaintiff notified BCI of her intention to retire, effective August 28, 2020.

{¶23} Kwek testified that she did not discuss plaintiff's retirement with her, and that she was copied on an email that plaintiff had elected to retire. Plaintiff's position was posted, and Hallie Dreyer, who, according to Kwek is probably in her late 30s, was selected.[2] Now, there are only two lab supervisors: Sarah Smith and Hallie Dreyer. Slaper is currently DNA lab manager and Duvall is lab manager for comparative sciences. According to Kwek, two supervisors (Duvall and Diane Garris) are over 50 years old, and Elizabeth Benzinger is a supervisor over 60 years old.

{¶24} Plaintiff admitted on cross-examination that Kwek never made any ageist comments to her. Plaintiff did not file any formal complaint of age discrimination until after her retirement paperwork had been accepted. Plaintiff testified that she had planned on working an additional three years, and that her monthly OPERS benefit is $5,800. Plaintiff submitted a printout from OPERS of what her projected monthly benefit would have been if she retired on January 1, 2024, which estimated her monthly benefit as $7,876. (Plaintiff's Exhibit 7.)

**Conclusions of Law**

### Constructive Discharge

{¶25} R.C. 4112.02 provides, in pertinent part, that: "It shall be an unlawful discriminatory practice: (A) For any employer, because of the * * * age * * * of any person, * * * to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any other matter directly or indirectly related to employment." To prevail, plaintiff must "present[] evidence, of any nature, to show that an employer more likely than not was motivated by discriminatory intent." *Mauzy v. Kelly Servs., Inc.*, 75 Ohio St.3d 578, 664 N.E.2d 1272 (1996), paragraph one of the syllabus. Plaintiff does not present any direct evidence of discriminatory intent. *See Smith v. Superior Prod., LLC*, 2014-Ohio-1961, 13 N.E.3d 664, ¶ 16 (10th Dist.) ("Direct evidence of discrimination

---

[2] Although Dreyer testified at trial, counsel did not ask Dreyer her date of birth.

is evidence of any nature, which if believed, is sufficient by itself to show the employer more likely than not was motivated by discriminatory animus in its action.")

{¶26} Absent direct evidence, plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Hall v. Ohio State Univ. College of Humanities,* 10th Dist. Franklin No. 11AP-1068, 2012-Ohio-5036, ¶ 13-14. To establish a prima facie case of age discrimination, plaintiff must demonstrate that she "(1) was a member of the statutorily protected class, (2) was discharged, (3) was qualified for the position, and (4) was replaced by, or the discharge permitted the retention of, a person of substantially younger age." *Pettay v. DeVry Univ., Inc.,* 10th Dist. Franklin No. 19AP-762, 2021-Ohio-1380, ¶ 22, quoting *Coryell v. Bank One Trust Co. N.A.*, 101 Ohio St.3d 175, 2004-Ohio-723, 803 N.E.2d 781, ¶ 20. The magistrate notes that Dreyer was selected for plaintiff's position after her retirement, and although Dreyer's age was not established at trial, there seems to be no dispute that Dreyer is substantially younger than plaintiff. Therefore, the magistrate shall assume for purposes of this decision that plaintiff has established the first, third, and fourth elements of a prima facie case of age discrimination. However, the parties disagree on the second element. Defendant argues that plaintiff cannot prove a prima facie case of age discrimination because it did not discharge her and plaintiff voluntarily retired. While it is undisputed that plaintiff retired, plaintiff argues defendant constructively discharged her.

{¶27} "Constructive discharge is not itself a cause of action, but rather a means of proving the element of an adverse employment action where the employee resigns instead of being fired." *Fernandez v. City of Pataskala*, S.D.Ohio No. 2:05-CV-75, 2006 U.S. Dist. LEXIS 82136 * 52 (Nov. 9, 2006). To establish that she was constructively discharged, plaintiff must demonstrate that "the employer's actions made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign." *Mauzy v. Kelly Servs, Inc.*, 75 Ohio St.3d 578, 588-589, 664 N.E.2d 1272 (1996). Particularly, a court must determine "whether the cumulative effect of the employer's actions would make a reasonable person believe that termination was imminent." *Id.* at 589. Indeed, "there is no sound reason to compel an employee to struggle with the inevitable simply to attain the 'discharge' label." *Id.* To make this determination, the court must consider the totality of the circumstances, "including

reductions in sales territory, poor performance evaluations, criticism in front of coemployees, inquiries about retirement intentions, and expressions of preference for employees outside the protected group." *Id.*

{¶28} Upon review of the evidence presented at trial, the magistrate finds that plaintiff has failed to prove, by a preponderance of the evidence, that her working conditions were so intolerable that a reasonable person under the circumstances would have felt compelled to resign. Specifically, the magistrate finds that plaintiff has failed to prove that the cumulative effect of Kwek's actions would make a reasonable person believe that termination was imminent. The evidence is uncontroverted that plaintiff was never formally disciplined pursuant to defendant's progressive discipline policy. While it is true that plaintiff was placed on a PIP, the testimony and evidence, including defendant's employment policies, show that a PIP is not a form of discipline. Moreover, despite plaintiff's testimony that she was never formally notified that she completed the PIP, both Schwaderer and Kwek testified credibly that plaintiff had successfully completed the PIP during the applicable four-week period in October 2019. The attachments to Defendant's Exhibit H corroborate Schwaderer's testimony that plaintiff successfully completed the PIP.

{¶29} Plaintiff testified that Kwek threatened her with discipline in the form of both a verbal reprimand reduced to writing, and a written reprimand. However, despite plaintiff's assertions, the evidence shows that no formal discipline was ever issued to plaintiff as a result of the incidents testified to at trial. Because defendant follows a progressive discipline policy, the magistrate finds that plaintiff has failed to prove by a preponderance of the evidence that a reasonable person would have believed that termination was imminent in August 2020.

{¶30} The evidence does show that Kwek used direct and sometimes gruff language when critiquing plaintiff's job performance, and that such criticism is reflected in emails that were sent to some of her coworkers, including Slaper, Schwaderer, and Maddox. In addition, Kwek did not deny asking plaintiff about her retirement intentions one time in June 2020. However, defendant's employment policies specifically state that counseling is not a form of discipline. Inasmuch as plaintiff was never formally disciplined in 2019 or 2020, the magistrate finds that she has failed to prove that she was

constructively discharged. Hence, the magistrate finds that plaintiff has failed to prove a prima facie case of age discrimination.

{¶31} Even assuming arguendo that plaintiff had established that she was constructively discharged and, thus, had stated a prima facie case of age discrimination, the magistrate finds that defendant has proffered legitimate, non-discriminatory reasons for the challenged conduct. Specifically, defendant has shown, through the credible testimony of Kwek, Herdeman, Dreyer, Kulp, and Schwaderer, that any arguably adverse employment action taken against plaintiff was in response to other employees' complaints about plaintiff's work performance or communication skills.

{¶32} With defendant having proffered a non-discriminatory justification for its conduct, the burden shifts to plaintiff to demonstrate that discriminatory animus was the real motivation for the challenged conduct. *Kundtz v. AT&T Solutions, Inc.*, 10th Dist. Franklin No. 05AP-1045, 2007-Ohio-1462, ¶ 32, 37. To refute defendant's legitimate, non-discriminatory justification, plaintiff must "show either that the proffered reason: (1) has no basis in fact; (2) did not actually motivate the defendant's challenged conduct; or (3) was insufficient to warrant the challenged conduct." *Id.* at ¶ 32.

{¶33} Upon review of the evidence and testimony presented at trial, the magistrate finds that plaintiff has failed to prove, by a preponderance of the evidence, that defendant's legitimate, non-discriminatory reasons had no basis in fact, did not actually motivate defendant's challenged conduct, or were insufficient to warrant the challenged conduct. Again, plaintiff was never formally disciplined, so the challenged conduct at issue is the PIP, the emails from Kwek, and any counseling that Kwek gave to plaintiff in meetings about the above-mentioned incidents. Based upon the evidence presented at trial, the magistrate finds that the testimony of Kwek, Herdeman, Dreyer, Kulp, and Schwaderer was more persuasive and credible than plaintiff's testimony. Specifically, the greater weight of the evidence shows that plaintiff's lack of communication with staff led to misunderstandings about testing protocols, staff attendance, and prior to the PIP was a source of low morale in the lab. In short, plaintiff has failed to prove that the PIP, emails, and counseling from Kwek were a pretext for age discrimination.

**Hostile Work Environment**

{¶34} To establish a prima facie case of hostile work environment created by age discrimination, plaintiff must show that she was "(1) a member of a protected class, (2) was subjected to unwelcome harassment because of age, (3) that had the effect of unreasonably interfering with the employee's work performance and creating an objectively intimidating, hostile or offensive work environment." *Hoyt v Nationwide Mut. Ins. Co.*, 10th Dist. Franklin No. 04AP-941, 2005-Ohio-6367, ¶ 68. When determining whether the harassment created an intimidating, hostile or offensive work environment, a court must consider the totality of the circumstances, including "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with the employee's work performance." *Chapa v. Genpak, LLC*, 10th Dist. Franklin No. 12AP-466, 2014-Ohio-897, ¶ 34. For the same reasons as discussed above, the magistrate finds that plaintiff has failed to prove, by a preponderance of the evidence, that she was subjected to unwelcome harassment because of her age, that the harassment had the effect of unreasonably interfering with her work performance, or that it created an objectively intimidating, hostile or offensive work environment. Kwek's one-time question about whether plaintiff was considering retirement in June 2020 is insufficient as a matter of law to support a hostile work environment claim: it was one time, it was not physically threatening, humiliating, or an offensive utterance, and it did not unreasonably interfere with plaintiff's work. Moreover, simple "inquiries into retirement plans do not generally constitute evidence of discrimination". *Anderson v. U.S. Bank Natl. Assn.*, S.D.Ohio No. 2:14-cv-2167, 2016 U.S. Dist. LEXIS 84728, *29 (June 28, 2016), citing *MacDonald v. United Parcel Serv.*, 430 Fed.Appx. 453, 460 (6th Cir.2011); *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir.1997).

**Conclusion**

{¶35} For the reasons set forth above, the magistrate finds that plaintiff has failed to prove any of her claims by a preponderance of the evidence and recommends judgment in favor of defendant.

{¶36} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that*

*14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

HOLLY TRUE SHAVER
Magistrate

**Filed April 19, 2023**
**Sent to S.C. Reporter 6/2/23**